ST. PAUL INSURANCE COMPANY
and AMERICAN BURGER SYSTEMS, INC.
*v.* Deborah TOUZIN

79-318                                            592 S.W. 2d 447

Opinion delivered January 21, 1980
(In Banc)

540

*Laser, Sharp, Haley, Young & Huckaby, P.A.*, for petitioners.

*O. W. Pete Wiggins, Sr.*, for respondent.

GEORGE ROSE SMITH, Justice. Gordon Bruce Touzin, of North Little Rock, was an employee of American Burger Systems, which had eating places in Pulaski and Hot Spring counties. At about 2:00 a.m. on January 6, 1977, Touzin was killed when the company van he was driving at high speed struck a bridge abutment in Saline County and left the highway. The Workers' Compensation Commission denied this claim for death benefits, finding that Touzin's intoxication was a substantial cause of his death. The circuit court affirmed. The Court of Appeals reversed, holding that there was no substantial evidence to support the Commission's finding of intoxication.

On the issue of intoxication the decisive evidence before the Commission was the report of a blood-alcohol test which showed that Touzin's blood contained more than twice the percentage of alcohol that is presumed to show

intoxication. Ark. Stat. Ann § 75-1031.1 (A) (3) (Repl. 1979). The Court of Appeals held that the insurance carrier had not laid a sufficient foundation for the introduction of the test, by showing that it was taken in compliance with the statute and regulations. §§ 75-1045 and -1046. We granted certiorari to consider the interaction between the statute and the section of the Workers' Compensation Law which provides that the Commission shall not be bound by technical or statutory rules of evidence or by technical or formal rules of procedure. Ark. Stat. Ann. § 81-1327 (Repl. 1976).

In harmony with many decisions on the point, we view the evidence in the light most favorable to the Commission's decision. Touzin left the company's place of business in Malvern at about five o'clock on the afternoon preceding his death. There is no evidence of his activities between that time and about 12:45 a.m., when he rang the doorbell at the home of Mr. and Mrs. Neil Deimel, who had gone to bed. Mrs. Deimel was the manager of the company's restaurant in Malvern. Mr. Deimel went to the door and explained that his wife, whom Touzin wanted to see, had retired. Touzin visited with Deimel and left at about 1:30. Deimel testified that there was no indication that Touzin had been drinking. His wife heard the conversation between Touzin and her husband and reached the same conclusion.

The fatal accident occurred on the highway about 20 miles from the Deimel home. Touzin's vehicle struck the bridge abutment, traveled along the top of the concrete guard rail for some 63 feet, and hurtled through the air to a point beyond the fence bordering the right of way. State Trooper Bailey arrived within a few minutes. He testified that the engine of the vehicle was back in the passenger area and Touzin was lying dead in the rear part of the van. Officer Bailey smelled the odor of alcohol and saw one or two empty beer cans in the van. He wanted a blood-alcohol test and called the county medical examiner, Dr. Kirk, who came to the scene and helped remove the body. At the Saline Memorial Hospital Dr. Kirk withdrew a blood sample from the decedent's heart and turned it over to a registered nurse who was present. She labeled the sample and later delivered it to Mrs. Rose, a medical technician with 12 years' experience,

who tested the blood sample. All blood tests for law enforcement agencies in Saline county were done at the hospital's laboratory.

In testing the blood Mrs. Rose put it in a machine that used the enzymatic method, which had been evaluated and approved by the State Health Department in 1970. Mrs. Rose testified that the machine had been approved by that Department. She said that the machine is kept constantly in calibration, by calibrating it every day with controlled products. The chief medical technologist at the hospital also testified that the machine had been approved, but she explained that they did not get formal written approval until some four months later, when the issue was raised as a result of this case. The Commission specifically found that the machine had been certified and approved by the Arkansas State Department of Health.

Dr. Kirk testified that the blood-alcohol reading of .20 percent showed a state of intoxication, indicating the consumption of the equivalent of more than 10 cans of beer. Touzin's widow, the claimant, testified that her husband drank "a few beers now and then." She said she had never observed him under the influence of alcohol, but she admitted that when the police telephoned to inform her of the tragedy she asked if alcohol had been involved.

The Court of Appeals, for two reasons, was mistaken in holding that the insurance carrier had not laid a sufficient foundation for the introduction of the results of the blood-alcohol test.

First, the compensation law provides that the Commission is not bound by technical rules of evidence or procedure, but may "conduct the hearing in a manner as will best ascertain the rights of the parties." § 81-1327, *supra*. Professor Larson discusses at length the cases construing such provisions in workers' compensation statutes. He concludes that the factfinders are expected to adhere to basic rules of fair play, such as recognizing the right of cross examination and the necessity of having all the evidence in the record. On the other hand, a compensation commission undoubtedly

has expertise much superior to that of a jury in the weighing of testmony and should therefore be left to determine the probative value of hearsay testimony and other proof that might not be admissible in a court of law. Larson, Workmen's Compensation Law, §§ 79.00 and 79.80 — 79.84 (1976). The admissibility of the blood-alcohol test falls in the latter category.

Here the Commission, within the leeway conferred by the compensation law, certainly conducted the hearing in such a manner as to best ascertain the rights of the parties. Only four persons had any part in the blood-alcohol test: Officer Bailey, who ordered it, a licensed physician, a registered nurse, and an experienced technologist whose qualifications were shown. All four testified and were cross examined. The machine had been approved and was constantly kept in proper calibration. The Commission was fully justified in finding that the test results had probative value.

Second, the testimony would have been admissible even under the more strict rules that prevail in a court of law. The statutes regulating blood-alcohol tests are primarily intended for criminal cases, but they are pertinent when such a test is used in civil litigation. *Newton* v. *Clark*, 266 Ark. 237, 582 S.W. 2d 955 (1979). Even in criminal cases, however, substantial compliance with the statute and with the Health Department rules is all that is demanded. *Munn* v. *State*, 257 Ark. 1057, 521 S.W. 2d 535 (1975). That degree of compliance was shown in this case.

The Court of Appeals in effect required an *affirmative* showing of the strictest possible compliance, by emphasizing various *negative* aspects of the record: The absence of proof that Mrs. Rose had been certified by the Department, or that Officer Bailey had initialed the sample, or that Dr. Kirk had drawn the required amount of blood or taken precautions against its dilution with "pleural or pericardial fluids." Those details are for the most part not in the statute but in the Department of Health regulation.

Judicial notice may be taken of that regulation, but the proper procedure is for the party relying on such judicial

notice to aid the court or administrative law judge by calling attention to the regulation. *Turnage* v. *Gibson*, 211 Ark. 268, 200 S.W. 2d 92 (1947); Uniform Evidence Rule 201 (d), Ark. Stat. Ann. § 28-1001 (Repl. 1979). Here there was no reference to the regulation during the taking of the testimony; it first appears in a brief filed after the hearing. And even then the deficiencies specified by the Court of Appeals were not mentioned by counsel. It would have been a simple matter, while the witnesses were on the stand, for opposing counsel to ask about each of the deficiencies, had they been thought material. As we have said in a similar situation: "If counsel thought that no proper foundation had been laid, the point should have been brought specifically to the court's attention. Had that course been followed the omission now complained of might readily have been supplied in the trial court." *Conway* v. *Hudspeth*, 229 Ark. 735, 318 S.W. 2d 137 (1958). We find ample substantial evidence to support the Commission's decision.

Reversed.